**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SUPERVALU, INC.,                    )
                                    )   Civil Action No. 05-0737
          Plaintiff,                )
                                    )   Judge Joy Flowers Conti
                                    )
     v.                             )   Magistrate Judge Caiazza
                                    )
BOARD OF TRUSTEES OF THE            )
SOUTHWESTERN PENNSYLVANIA           )
AND WESTERN MARYLAND AREA           )
TEAMSTERS AND EMPLOYERS             )
PENSION FUND a/k/a THE              )
TRUSTEES OF THE SOUTHWESTERN        )
PENNSYLVANIA AND WESTERN            )
MARYLAND AREA TEAMSTERS AND         )
EMPLOYERS PENSION FUND,             )
                                    )
          Defendants.               )

## REPORT AND RECOMMENDATION

### I. Recommendation

Acting pursuant to Sections 4301 and 4221 of the Employee Retirement Income Security Act of 1974 ("ERISA" or "the Act"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1451 and 1401, SUPERVALU filed a complaint in this court seeking modification of a final arbitration award made in favor of The Board of Trustees of the Southwestern Pennsylvania and Western Maryland Area Teamsters and Employers Pension Fund ("the Fund"). The award was based on the Arbitrator's finding that SUPERVALU violated 29 U.S.C. 1392(c) by executing an agreement with its employees' union in order to evade or avoid withdrawal liability to the Fund. Ruling on cross

-1-

motions for summary judgment, the Arbitrator granted summary judgment in favor of the Fund, obligating SUPERVALU to pay withdrawal liability in the amount of $4,316,996.00. Because the court is left with the firm impression that the Arbitrator erred in applying the law to the facts of this case, it recommends that the Arbitrator's final award be set aside. The Motion for Summary Judgment filed by SUPERVALU (Doc. 13) should be granted, and the Motion for Summary Judgment filed by the Fund (Doc. 11) should be denied.

## II. <u>Factual and Procedural Background</u>

The facts are undisputed. In 2002, SUPERVALU, a nationwide wholesale food distributor, operated a facility in Belle Vernon, Pennsylvania. Pursuant to sequential collective bargaining agreements made with representatives of Teamsters Local 872 ("the Union"), SUPERVALU contributed to a multiemployer pension plan established to provide retirement benefits to eligible union employees. The 2002 bargaining agreement was scheduled to expire at the end of January 2003. Approximately one year prior to the expiration date, SUPERVALU, responding to a business downturn, decided to close its Belle Vernon facility, consolidating that operation with another in New Stanton.

Hoping to accomplish this reorganization in the summer of 2002, SUPERVALU initiated discussions with the Union in the spring to resolve issues associated with the effects of the

closing. One of these issues - how long SUPERVALU would continue to contribute to the pension plan - had significant economic repercussions for SUPERVALU.

The MPPAA provides that an employer, for various reasons, may opt out of a multiemployer pension plan. Where there is a complete withdrawal[1] the employer immediately incurs "withdrawal liability" to the Fund. This liability is defined as "the employer's proportionate share of the plan's 'unfunded benefits,' calculated as the difference between the present value of the vested benefits and the current value of the plan's assets." Robbins v. Pepsi Metro. Bottling Co., 636 F. Supp. 641, 647 (N.D. Ill. 1986)(quoting Pension Ben. Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 725 (1984)).

The Act specifies that withdrawal liability is to be calculated with reference to a plan's unfunded benefits outstanding at the end of the plan year preceding the year of an employer's withdrawal. 29 U.S.C. § 1391(b)(2)(A)(ii). Because the Fund's plan year ended on June 30, the amount owing in the event of SUPERVALU's withdrawal during the 2002 plan year would have been based on the Fund's unfunded vested benefits as of June 30, 2001. Similarly, withdrawal liability for the plan year 2003

---

[1]ERISA provides that a complete withdrawal occurs if an employer (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan. 29 U.S.C. 1383(a).

would have been calculated on the basis of unfunded vested benefits outstanding as of June 30, 2002.

 In April 2002, SUPERVALU consulted the Fund's actuary. It learned that if it withdrew in plan year 2002, it would not incur withdrawal liability because, at the end of 2001, the Fund did not have unfunded benefits. Due to a drop in the value of Fund assets, withdrawing in plan year 2003 would result in significant withdrawal liability, based on the 2002 shortfall.

In order to effect the less costly 2002 withdrawal, SUPERVALU negotiated a revised collective bargaining agreement with the Union, terminating its obligation to contribute to the Fund as of the end of June 2002. In return for the Union's consent to this termination, SUPERVALU offered and the Union accepted lump sum severance pay and wage premiums. There was nothing clandestine about this agreement; each party understood the financial implications of the withdrawal date. On June 26, 2002, SUPERVALU remitted its final payment of the 2002 plan year, and notified the Fund that it would not make contributions beyond June 29.

About eight months after the withdrawal, the Fund demanded that SUPERVALU begin payments on withdrawal liability of more than four million dollars. This liability assessment was based on the Fund's conclusion that SUPERVALU had not withdrawn from the plan until 2003, and was liable for its pro rata share (23%) of

-4-

the Fund's unfunded vested benefits outstanding at close of plan year 2002.

The Fund contended that SUPERVALU had not withdrawn from the Fund until 2003 because its attempt to limit its liability by withdrawing on the last day of plan year 2002 violated the terms of 29 U.S.C. § 1392(c).[2] Under this section:

> If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction.

According to the Fund, SUPERVALU's purported 2002 withdrawal from the plan and the bargaining agreement upon which it was based should be disregarded. This pushed the withdrawal date into plan year 2003, the year in which SUPERVALU closed its Belle Vernon operation. The Arbitrator found in favor of the Fund, and issued a final award for the full amount of the withdrawal liability assessed. This timely appeal followed.

### III. **Standard of Review**

An arbitrator's conclusions of law in a withdrawal liability case are subject to *de novo* review in federal court. Parmac, Inc. v. I.A.M. Nat'l Pension Fund Benefit Plan A, 872 F.2d 1069, 1071 (D.C.Cir.1989); Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp., 872 F.2d 208, 210-14 (7th Cir.)(1989);

---

[2]The parties raised additional issues before the Arbitrator that are not pursued here and will not be discussed.

<u>Union Asphalts and Roadoils, Inc. v. Mo-Kan Teamsters Pension Fund</u>, 857 F.2d 1230, 1233-34 (8th Cir. 1988). Arbitration is the primary method for resolution of disputes arising under ERISA and the arbitrators' decisions are entitled to deference. A court will not overturn an arbitrator's application of the law absent a firm conviction that an error was been made.

### IV. <u>Discussion</u>

#### A. <u>The Legal Basis for the Arbitrator's Award</u>

The parties do not contest and the court accepts the Arbitrator's summary of relevant facts:

> SUPERVALU was fully aware that its intended withdrawal from the Fund after June 30, 2002, would result in . . . substantial withdrawal liability due to the investment losses the Fund was experiencing during the plan year ending on that date. It accordingly induced the Union and its members to agree to terminate their existing [collective bargaining agreements] . . . as of June 29, 2002, and to replace them with identical [agreements] stripped of the obligation to contribute to the Fund, thus effecting withdrawal from the Fund one day short of plan year end. To secure the agreement of the Union and its members, SUPERVALU agreed to share the resulting liability withdrawal savings . . . .

(Arb. Findings, Op. and Award 7-8). Based on these findings and the language of Section 1392(c), the Arbitrator concluded that the bargaining agreement between SUPERVALU and the Union setting the date on which SUPERVALU would no longer contribute to the Fund should be disregarded. He wrote:

Giving the [evade and avoid] provision [of Section

> 1392(c)] a straightforward reading, and according
> to its words their natural meaning, the conclusion
> seems inescapable that just such a transaction
> occurred here.

Id. at 7. The Arbitrator did not cite authority endorsing this reading of the provision.

SUPERVALU challenged the Arbitrator's reliance on Section 1392(c) on the ground that the provision does not apply to a bona fide collective bargaining agreement setting the date of an employer's withdrawal from a plan. It argued that this is the law even where the parties to the agreement concede that the date was chosen in order to minimize the employer's withdrawal liability.

The Arbitrator rejected SUPERVALU's argument, finding that adopting SUPERVALU's position would perpetuate the very problems that ERISA and the MPPAA were enacted to correct:

> SUPERVALU and its employees had the benefit of
> a full year of participation - including the
> accrual of a full year's worth of pension
> benefits - during which the Fund suffered
> losses, but by maneuvering, with the Union's
> acquiescence, to pull out one day short of
> year end, [SUPERVALU] attempted to avoid any
> responsibility for underfunded liabilities
> associated with that experience. As a result,
> the full burden of funding those liabilities
> would be shifted to those employers who
> remained - one of the consequences that
> the MPPAA was specifically intended to prevent.

Id. at 12(footnote omitted).[3] On this basis, the Arbitrator

---

[3]In this statement, the Arbitrator seems to say that SUPERVALU accrued withdrawal liability before the actual withdrawal, beginning at the point where the Fund developed unfunded vested benefits. In its decision in Trustees of Teamsters Pension Trust Fund of Philadelphia and Vicinity v. Federal Express Corp., No. 86-304 1995 U.S. Dist.

upheld the Fund's assessment of withdrawal liability.

## B. <u>Analysis</u>

The precise question raised here appears to be one of first impression. The court has not found, and has not been directed to another decision invoking ERISA's evade or avoid provision to invalidate the terms of a bona fide arms length collective bargaining agreement. In fact, there are few cases construing Section 1392(c)in any context.  For the reasons detailed below, the court is nonetheless convinced that the arbitrator erred in disregarding the date of withdrawal specified in the collective bargaining agreement considered here.

## <u>1</u>. <u>The Statutory Framework</u>

Because this appeal turns on the underlying purpose and the interpretation of the MPPAA, the court looks first to the broad

---

Lexis 1980, at*24 (D. Del. December 27, 1995), the District Court rejected this position, writing: "The section of MPPAA that defines withdrawal liability . . . does not support this reading." This court agrees. Section 1381(a) states: "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, *then* the employer is liable to the plan." (emphasis added). The same interpretation of this section was adopted by the Court of Appeals in <u>Godchaux v. Conveying Techniques, Inc.</u>, 846 F.2d 306, 310 (5th Cir. 1988):

> Unfunded vested liability does not completely define or determine withdrawal liability. ERISA does not impose withdrawal liability on every employer that belongs to a pension plan that has an unfunded vested liability. Moreover, ERISA *calculates withdrawal liability according to when the employer withdraws from the pension plan.*

*(*emphasis added*).*

goals of the Act and the scheme designed to achieve them. ERISA took effect in 1974 to ensure that "if a worker has been promised a defined pension benefit upon retirement - and if he has fulfilled whatever conditions are required to obtain a vested benefit - he actually will receive it." Nachman Corp. v. Pension Ben. Guar. Corp, 446 U.S. 359, 375 (1984). In the years immediately following its enactment, ERISA's shortcomings became apparent. The primary criticism leveled at the Act was its failure to "protect plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or [withdrew] from multiemployer plans." R.A. Gray, 467 U.S. at 723.

In order to remedy this flaw, Congress amended ERISA by enacting the MPPAA in 1980. The MPPAA changed the strategic considerations for an employer contemplating withdrawal:

> It transformed what was only a risk (that a withdrawing employer would have to pay a fair share of underfunding) into a certainty. That is to say, it imposed a withdrawal charge on all employers withdrawing from an underfunded plan whether or not the plan later became insolvent. And, it set forth a detailed set of rules for determining and collecting that charge.

Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co., 513 U.S. 414, 417 (1995). In other words, the MPPAA required that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the abandoned plan. Robbins, 636

F.Supp. at 668. This debt or withdrawal liability is the proportionate share of the plan's unfunded vested benefits[4] and is calculated as the difference between the present value of the vested benefits and the current value of the plan's assets. Id., at 671 n.41; 29 U.S.C. §§ 1381, 1391. This exposure to a significant financial penalty was intended to reduce the employers' incentive to leave the plan, and to cushion the financial impact on a plan should a withdrawal occur. R.A. Gray, 467 U.S. at 724.

## 2. Application of the Law

Evaluating the facts of this case against the background of the law, the Arbitrator concluded, in effect, that the MPPAA provisions governing withdrawal liability were inadequate to safeguard the financial welfare of the Fund. In an effort to remedy this perceived inadequacy, the Arbitrator ventured beyond the MPPAA into virgin legal territory, ignoring the terms of the parties' bona fide collective bargaining agreement and conditioning SUPERVALU's right to withdraw on the financial status of the plan. The court is convinced that the Arbitrator's application of section 1392(c) to the facts of this case is

---

[4]The Act provides different methods for computing withdrawal liability. Each method involves allocating the plan's unfunded vested benefits among the participating employers. Unfunded vested benefits are defined as the actuarial present value of all nonforfeitable benefits under the plan, minus the value of the plan's assets. 29 U.S.C. Sections 1391; and 1393(a)(1).

inconsistent with the Act and contrary to relevant case law. The court draws from a number of sources to support this conclusion.

The court turns first to the decision in an arbitration proceeding with markedly similar facts conducted four years after enactment of the MPPAA. In <u>Int'l Typographical Union Negotiated Pension Plan and Ft. Worth Telegram</u>, 5 Empl. Benefits Cases 1193,(Mittleman, Arb., March 9, 1984), a collective bargaining agreement between the Fort Worth Star Telegram ("the Star") and the Fort Worth Typographical Union Local("ITU") obligated the Star to contribute to a multi-employer pension plan. During renegotiation of the agreement in August 1981, the Star proposed that it discontinue plan contributions in favor of increasing employee wages. The ITU agreed to this proposal and, knowing that the Star was concerned about the extent of its exposure to withdrawal liability, allowed the Star to set the date of withdrawal.

The Star determined that withdrawing at any point though December 31, 1982, would result in liability totaling $79,376. If, however, it could delay withdrawal into 1983, it would not have liability. This was because the plan did not have unfunded assets at the close of the 1982 plan year. The Star opted to terminate its pension obligation at 12:01 a.m. on January 2, 1983. There was no attempt to conceal the fact that the date set was selected in order to minimize its withdrawal liability.

The plan sought to compel the Star to pay withdrawal liability as though it had left the pension plan in 1982. The plan contended, as the Fund does here, that the withdrawal date established in the collective bargaining agreement should be disregarded under section §1392(c). It argued that the Star violated that section when it "manipulate[d] the date for cessation of its contributions solely for the purpose of evading or avoiding withdrawal liability." Id., at 1195.

The ITU arbitrator rejected this argument in a multi-step analysis, much of which is applicable here. He first observed that the 1983 withdrawal date was an integral part of a bona fide arms length collective bargaining agreement benefitting both parties. Concluding that this was not the type of transaction targeted by Section 1392(c), the arbitrator wrote:

> This section is totally inapplicable on the facts herein presented. The terms "evade or avoid" have a well understood meaning in the law. They refer to essentially fraudulent transactions . . . which are designed to prevent the employer from actually being assessed the true withdrawal liability which it owes under the statute.

Id. at 1197. The Star had complied with its statutory obligation, and there was not a reasonable basis for contending otherwise.

The court agrees with the ITU arbitrator that section 1392(c) must be considered in the context of the Act as a whole. The MPPAA does not contain a provision authorizing a plan to select a contributor's withdrawal date. Instead, "the law is

-12-

clear that an employer's withdrawal liability under the MPPAA
must be determined by looking at the employer's collective
bargaining agreement." Parmac, Inc. v. I.A.M. Nat'l Pension Fund
Ben. Plan A, 871 F.2d 1069, 1072 (D.C. Cir. 1986).

Under the terms of the MPPAA, withdrawal liability and the
collective bargaining agreement are inextricably linked. Section
1381 states that "complete withdrawal" from a plan occurs when an
employer "permanently ceases to have an obligation to contribute
under the plan." The "obligation to contribute", is defined as
"an obligation to contribute arising under one or more collective
bargaining agreements." 29 U.S.C. §1392(a)(1). In ITU, as in this
case, the arbitrator recognized that the bona fide collective
bargaining agreement fixed the end date of the employer's
obligation to contribute to the pension plan. His observation
applies with equal force here:

> The Plan has not pointed to anything in the
> National Labor Relations Act, or any other
> law, which precludes the parties from picking
> whatever date they wish to determine when the
> employer's obligation to contribute to a
> multi-employer pension plan will cease. . .
> The matter is simply left to the business
> judgment of the employer, and its ability to
> obtain agreement from the union with which it
> negotiates.

5 Empl. Benefits Cases at 1198.[5] There is no statutory support

---

[5]This observation is echoed in the case law. "[T]he parties
to a [collective bargaining agreement] may freely determine the extent
of the employer's obligation to contribute to a fund, including the
exact date of withdrawal." Malden Mills Industries, Inc., v. ILGWU

for the proposition that a fund "is simply . . . free to disregard the economic reality of [a] transaction in order to impose a greater withdrawal liability." Id. The court agrees. The Act as a whole dictates that the collective bargaining agreement between SUPERVALU and the Union be given effect; the date of withdrawal specified in that agreement is controlling.

This result is reinforced by the small body of case law which has considered the scope of Section 1392(c).[6] In Cuyamaca Meats, Inc., v. San Diego and Imperial Counties Butchers' and Food Employers' Pension Trust Fund, 827 F.2d 491 (9th Cir. 1987), the Court of Appeals held that an employer's decision to pursue collective bargaining to the point of impasse in order to delay its withdrawal from a pension plan until the next plan year did not transgress Section 1392(c). This was the case although the motive for the delay was the reduction of withdrawal liability. Id. at 499. Explaining this result, the Court of Appeals quoted the section's legislative history which instructs the arbitrator, the plan sponsor, and the courts to "follow the substance rather than the form" of transactions alleged to run afoul of [section 1392(c)]. Id. at 449. The legislative history also indicates that

---

National Retirement Fund, 766 F. Supp. 1202, 1209 (D. Mass. 1991).

[6]Section 1392(c) has not been discussed frequently, but where it has been addressed, it has typically been construed narrowly. See Pension Trust Fund of Philadelphia and Vicinity v. Fed. Exp. Corp., No. 80-304, 1995 WL 791317 at *8 n.3 (D. Del. Dec. 27, 1995).

-14-

section 1392(c) was drafted in order that:

> employers not be able to evade or avoid
> withdrawal liability through changes in
> identity, form, or control, or through
> transactions which are less than bona fide
> and arm's length. [An employer] will not be
> able to evade withdrawal liability by going
> out of business and resuming business under
> a different identity.

126 Cong. Rec. 23038 (1980)(statement of Rep. Frank Thompson).

According to the Court of Appeals, bona fide arm's length

negotiations which are not deceptive and do not violate or

undermine the purposes of the MPPAA do not constitute evasion or

avoidance within the meaning of 1392(c).[7]

The Arbitrator in this case deemed the decision in <u>ITU</u>

irrelevant and rejected the reasoning of the Court of Appeals in

<u>Cuyamaca</u> because in those cases, the plan did not have unfunded

vested benefits at the time of the employer's withdrawal.

Consequently, the burden on the remaining employers did not

---

[7]Courts addressing the application of Section 1392(c)have done so most often where a conveyance of assets to or other dealings with subsidiaries are suggestive of bad faith. *See e.g.*, <u>Sherwin-Williams Co. v. N.Y.State Teamsters Conference Pension & Retirement Fund</u>, 158 F.3d 387 (2d Cir. 1998)(stating that weak financial status of subsidiary made avoid or evade motive more likely); <u>Santa Fe Pacific Corp. v. Central States, Southeast and Southwest Area Pension Fund,</u> 22 F.3d 725,729 (7th Cir. 1994)(finding employer's sale of subsidiary's stock instead of assets suggested intent to avoid or evade liability); <u>Flying Tiger Line v. Teamsters Trust Fund of Philadelphia</u>, 830 F.2d 1241 (3d Cir 1987)(focusing on whether sale of subsidiary's stock was sham transaction); <u>Dorn's Transportation, Inc. v. Teamsters Pension Trust Fund of Philadelphia</u>, 787 F.2d 897 (3d Cir. 1986)(finding that sale of motor freight business did not violate Section 1392(c) where, regardless of seller's motive, buyer continued to make payments to fund; characterizing Section 1392 as embodying "good faith" requirement).

change.

Although this view is superficially appealing, it does not comport with the Act. Congress did not address the risk that an employer's withdrawal would burden the remaining employers by forbidding withdrawal.[8] Nor did it tie the right to withdraw to the financial health of the plan. Instead, Congress chose to reduce that risk by requiring that an employer choosing to withdraw accept specific economic consequences.

The Arbitrator's approach to section 1396(c) unduly restricts an employer's ability to make economic decisions, imposing limitations on an employer's ability to withdraw from a plan that do not appear - even by implication - in the Act. Under the Arbitrator's reasoning, an employer and a union may agree to time a withdrawal to minimize the employer's withdrawal liability only if the plan is fully funded at the time of withdrawal. Stated another way, the Arbitrator's approach forbids an employer and a union from negotiating a withdrawal date in a plan year where the plan has or is predicted to have a shortfall, but was

---

[8]Congress underscored the right to withdraw in section 1401(e) of the Act. This section authorizes an employer to obtain from the plan sponsor "general information" in order "to compute its withdrawal liability." It also allows the employer to request "an estimate of . . .[its] withdrawal liability." This information is available to facilitate the employer's withdrawal decision. Reliable Liquors, Inc. v. Truck Drivers & Helpers Local Union No. 355 Pension Fund, 240 F. Supp. 2d 450 (D. Md. 2003).

healthy in the prior plan year.[9] Agreeing to a withdrawal date in a "down" year will trigger the application of 1392(c), nullifying the collective bargaining agreement, effectively forcing the employer to incur withdrawal liability or remain in the plan. The court does not find any reason to believe that this is what Congress intended.

The court's rejection of the Arbitrator's reading of Section 1392(c) does not mean that it fails to recognize that SUPERVALU's decision to favor its own economic interest by withdrawing from the plan on the very last day of the plan year seems, on its face, unfair. As is true of most legislation, however, the Act is not perfect. Admittedly, in some circumstances it is possible for employers and unions to squeeze through statutory loopholes in order to realize an economic advantage at the expense of others. Assuming, arguendo, that this was SUPERVALU's motive, its acts certainly did not rise above, nor did they fall below what the law requires. What is unfair, of course, is not always illegal.

_____

[9]The level of uncertainty created by the Arbitrator's reasoning is highly problematic. Is it permissible to set a withdrawal date in a current plan year if it is only <u>likely</u> that a plan will experience a shortfall? How likely must it be? Who will decide?

The conundrum can also be framed in terms of identifying the point in the plan year when section 1392(c) is applicable. The Arbitrator does not explain how it is possible to determine the date before which an employer must withdraw in order to avoid the application of Section 1392(c). Is an employer "safe" within the first six months of the year? Is November risky?

Although he sought to safeguard the economic well being of all of the employers contributing to a plan, the Arbitrator was not free to do so by adopting rules more stringent than those enacted by Congress.  The court is convinced that even where an employer withdraws from a plan with unfunded benefits, the <u>ITU</u> arbitrator's analysis is more faithful to the Act as a whole. Accordingly, the court adopts the following portion of that opinion as its holding:

> [The] MPPAA should be construed similarly to the Internal Revenue Code, under which taxpayers are encouraged to use all legitimate means to minimize their tax liability . . . The transaction . . . had full economic substance, insofar as the employer's and employees' relationship to the Plan [was] concerned. Nothing in the MPPAA requires an employer to pick a withdrawal date to the Plan's advantage rather than its own.

5 Empl. Benefits Cases at 1196.

## V. <u>Conclusion</u>

For the foregoing reasons, the court recommends that the Arbitrator's award be set aside. The Motion for Summary Judgment filed on behalf of SUPERVALU (Doc. 13) should be granted; SUPERVALU's withdrawal liability should be calculated based on its withdrawal at end of plan year 2002. The motion for Summary Judgment filed on behalf of the Fund (Doc. 11) seeking confirmation of the Arbitrator's award fixing SUPERVALU's withdrawal in plan year 2003 should be denied.

In accordance with the Magistrate's Act, 29 U.S.C. §

636 (b) (1) (B), 636 (b)(1)(b) and (c), and Rule 72.1.4 (B) of
the Local Rules for Magistrates, objections to this Report and
Recommendation are due by May 2, 2006. Responses to objections
are due by May 12, 2006.


April 11, 2006




                                        /S/ Francis X. Caiazza
                                        Francis X. Caiazza
                                        U.S. Magistrate Judge


cc:
Brian Black, Esq.
Thomas M. Christina, Esq.
Donald S. Prophete, Esq.
Ogletree, Deakins, Nash,
Smoak & Stewart, P.C.
Two Pershing Square
2300 Main Street, Suite 900
Kansas City, MO 64108


Vincent P. Szeligo, Esq.
Brendan R. Delaney, Esq.
Wick, Strieff, Myer,
O'Boyle & Szeligo, P.C.
1450 Two Chatham Center
Pittsburgh, PA 15219